

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-10-00094-CV

IN THE INTEREST OF L.T. AND
K.B., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant A.L. (Mother) appeals the trial court's order terminating her parental rights to her children, L.T. and K.B. Appellant R.T. (Richard) appeals the termination of his parental rights to L.T., and appellant G.B. (George) appeals the termination of his parental rights to K.B.[2] The parents contend that the evidence is legally and factually insufficient to show that termination of their rights

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the identity of the parties, we will identify them through initials or portions of their names. *See* Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008); Tex. R. App. P. 9.8(b).

is in the best interests of the children, and Mother also argues that the trial court erred by denying her motion for continuance. We affirm.

**Background Facts**

Mother and Richard are the parents of L.T.; Mother and George are the parents of K.B. On April 2, 2009, while the children were living with Mother, George, and George's roommate, Child Protective Services (CPS) received an allegation that methamphetamine was being manufactured in a garage next to the home.[3] One of CPS's employees, Melinda Esquibel, went with four narcotics officers to the home, where they found Mother's sister, Melinda Bednar. Mother was not initially at the home, but the children were, and Bednar was holding L.T. Neither father was there. The children stunk because they were dirty and their diapers had not been recently changed.

Outside of the home, Esquibel saw surveillance cameras, and inside the home, she saw clutter, unwashed dishes, what she believed to be a drug pipe with liquid inside, and marijuana that was within reach of L.T. Eventually, Mother arrived at the residence; she had dark circles under her eyes, was "very slurred in her words," and was not engaged in her conversation with Esquibel. Mother admitted that she was using marijuana and said that she had used methamphetamine that day.

---

[3]In April 2009, L.T. was two years old and K.B. was a few months old.

After obtaining a search warrant, officers found a meth lab at the property where the children lived. Specifically, they discovered, in a small garage outside the residence, digital scales, "tons of" ephedrine tablets, lithium batteries, Coleman fuel, anhydrous gas generators, and a gas mask, which are all items related to methamphetamine production. They also discovered a full syringe located underneath a seat cushion inside the house; the syringe could have been reached by L.T.

CPS removed the children from the home and told Mother that she would need to work services, including drug treatment, to get the children back. Esquibel took the children to a hospital, where L.T. tested positive for methamphetamine.[4]

The Department of Family and Protective Services (the Department) filed a petition that asked for, among other relief, termination of each parent's rights to the children if reunification could not be achieved. The Department attached an affidavit that detailed the findings at the children's home. The trial court granted the Department temporary sole managing conservatorship of the children, appointed an attorney ad litem to represent them, and limited the parents' access to them to times arranged by the Department. The parents filed answers to the Department's petition. The children began living with a foster family.

---

[4]Esquibel's involvement in this case ended in May 2009.

3

In May 2009, the Department filed service plans that described the children's history and needs and gave the parents several particular tasks to achieve reunification with them. Later that month, the trial court found that the parents understood the service plans.

A few days before the termination trial in February 2010, Mother filed a motion for continuance on the grounds that her attorney was unprepared to proceed and that she needed more time to complete the service plan. Richard also asked for a continuance. During a hearing on Mother's continuance motion before the trial began, her counsel explained that Mother was awaiting resolution of a criminal charge. The trial court denied the continuance requests.

After the trial concluded, the court terminated each parent's rights to the children. It found that each parent knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. The court also found that Mother and George constructively abandoned the children and that termination of each parent's rights was in the children's best interests. The Department became the children's permanent managing conservator and received authorization to place them for adoption. The parents each filed a notice of appeal.

**Best Interests of the Children**

Each parent contends that the trial court's termination order should be reversed because the evidence is legally and factually insufficient to show that termination of their rights is in the best interests of the children. A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must prove that termination is in

5

the best interest of the child. Tex. Fam. Code Ann. § 161.001(2) (Vernon Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).[5] Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on

---

[5]None of the parents challenge the grounds for termination under section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1).

6

the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). In evaluating the parent's willingness and ability to provide the child with a safe environment, we may consider, among other factors, the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; the results

7

of psychiatric, psychological, or developmental evaluations of the child's parents; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other factors used to determine the best interest of the child include the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

8

**The parents' poor decisions**

**Mother's drug history and background**

During an interview that occurred a day after the children's removal in April 2009, Mother told Esquibel that her drug of choice was marijuana, which she used twice a week, and that she had been using methamphetamine on a daily basis. Mother cared for the children while she was under the influence of drugs. She believed that George also used methamphetamine. A few days after the children's removal, Mother came to a visit with the children smelling like methamphetamine. Mother had failed in the past to complete outpatient treatment for her drug use, but she told Esquibel that she would be willing to receive treatment at Recovery Resources in Arlington. Mother did not contact Esquibel after a telephone call on April 24, 2009.

Mother's involvement with drugs caused her incarceration that lasted until the time of the termination trial. CPS case worker Linda Phillips said that even if Mother had not been incarcerated, she would be concerned that Mother could not maintain a drug-free lifestyle and could not refrain from having a relationship with someone involved with drugs, such as Richard.

**George's drug history and background**

George conceded that drugs were used in his home and that the children possibly inhaled drug fumes. He denied knowing of the methamphetamine lab at the home. George was not employed when he talked to Esquibel, and he admitted that he had sold drugs "all his life." He was in jail when he talked to

9

Esquibel because of the methamphetamine that the officers found, but he said that he would be willing to complete inpatient drug treatment.[6]

George is not able to read or write, and he remained in jail from April 2009 until the termination trial in February 2010. He has a 2005 conviction for possession of certain chemicals with the intent to manufacture methamphetamine, of which he served a two-year sentence. He also has a 1990 conviction for delivering cocaine, of which he was placed on ten years' probation.

**Richard's evaluation with Dr. Nichelle Wiggins and his personal history**

Dr. Nichelle Wiggins, a licensed psychologist, evaluated Richard in August 2009. Richard told Dr. Wiggins that his involvement with the Department began because Mother and L.T. resided with a man who was arrested for manufacturing drugs (presumably George), and L.T. tested positive for methamphetamine. Richard was not surprised that there were drugs in the home because he knew Mother was using drugs. He expressed concern about Mother's neglect of L.T. because L.T. did not bathe sometimes and was not well taken care of. Richard acknowledged, however, that he did not try to remove L.T. from Mother's home because he was also using drugs and "didn't really know all his options of what he could have done . . . , so he basically did nothing."

---

[6]George was arrested for possessing chemicals with the intent to manufacture methamphetamine and other drug-related crimes. Mother was also arrested in connection with the drugs found at the residence. Mother's and George's criminal charges were still pending at the time of the termination trial.

At the time of Richard's interview with Dr. Wiggins, he was living with a friend who was using drugs, and other friends who visited him also used drugs. Richard admitted that he had used drugs for twenty years and that at one time, he used methamphetamine daily.[7] Richard used methamphetamine intravenously, by snorting it, and by eating it. He was able to buy drugs because he sold them. He told Dr. Wiggins, however, that because of his love for L.T. and prayer, he had not used drugs for approximately four months before the interview. But Richard had attended inpatient treatment for his drug use at various times in the past and would "use [drugs] as soon as he got out." Because of his drug addiction, Richard had not had his own place to live since 2003.

Richard had four children other than L.T., but he did not remain active with those children and did not have contact with three of them for fifteen years. Richard used drugs during his relationships with both of the mothers of his other four children.

Dr. Wiggins learned that Richard had been arrested for burglary in 1996, possession of cocaine in 1997, and theft in 2006. The theft occurred when he took a flat bed trailer to sell it for money to buy drugs.

---

[7]Richard also admitted his drug use and his knowledge of Mother's methamphetamine use to Esquibel.

11

Richard told Dr. Wiggins that he loved L.T. and was willing to stop using drugs to be involved with her. He said that he was employed helping landlords do various jobs.

Dr. Wiggins was concerned about Richard's ability to raise L.T. because of his failure to protect L.T., unhealthy relationships, chronic drug use, legal problems, poor decisions, and absence as a father; she believed that he was "a very high risk to relapse" because of his twenty-year addiction and his decision to surround himself with people who used drugs. Dr. Wiggins was also troubled by the way Richard answered certain questions. For instance, when Richard was asked if there was one thing that he could change about himself, he said that he "wish[ed] [he] was tall." Dr. Wiggins therefore believed that Richard was not focused on L.T. and "highly recommended" that L.T. remain in protective care because the "prognosis was poor for any kind of significant progression."

Richard attended all of his visits with the children. In November 2009, during one of the visits, he admitted that he sells drugs, and he blamed a positive drug test on his drug-selling behavior. Mother said that Richard bought a new truck with money from selling methamphetamine.

Phillips conducted an unannounced visit of Richard's house; Richard did not let Phillips enter a room where he said that his cousin stayed, and Phillips also could not enter a locked storage area. Richard did not give Phillips background information on his cousins that resided with him. Phillips was concerned about the cleanliness and child-friendliness of the home (for instance,

12

there was a chainsaw on the floor in Richard's bedroom). Phillips believed that Richard was not drug-free at any point during the case, and she opined that he did not have parenting skills necessary to provide for L.T.'s needs. Richard told Phillips that at the time of the trial, he was making money by repairing and selling trailers.

**The parents' compliance with the service plans**

When Phillips began her involvement in the children's case, George was already incarcerated but Mother was not. Phillips did not discuss the service plan with Mother, however, until June 2009, at which time Mother was incarcerated. While in jail, Mother worked on some of the service plan and progressed toward obtaining a GED. She also participated in substance abuse programs (including Christians Against Substance Abuse), a bible class, and other religious classes. She did not complete parenting classes, a psychological evaluation, or individual counseling, but Phillips did not facilitate making those services available for Mother. Mother wanted to resume her relationship with Richard if she was released from confinement, but the timing of her release was uncertain. When Phillips was testifying about the completion certificates that Mother received, she said, "The biggest thing is what [parents] do when they get out of jail."

George did not take any classes while confined and did not communicate with Phillips even though Phillips told George that some of the classes could be completed while he was in jail.

13

Richard completed the psychological evaluation with Dr. Wiggins and parenting classes. He also started a drug program at Merit Family Services but was discharged in November 2009 for noncompliance because his "lifestyle centered around his choice of drugs." He then started another drug program in December 2009 and last visited that program in January 2010 (the month before the trial began) before he was also discharged from it because of a positive hair follicle drug test.[8] Richard was also discharged from individual counseling. He tested positive for methamphetamine in October 2009 and again in January 2010 (just a month before trial); he acted surprised when he learned of these results. Richard did not complete individual counseling.

**Possible familial placements**

After Esquibel told Mother that the children would be taken outside the home, Mother gave Esquibel some names of relatives for possible placement but was not able to give Esquibel contact information for most of those people. A few days later, Mother gave Esquibel names of paternal cousins but did not give Esquibel background information on the cousins so that a home study could be completed.

Richard asked that his aunt, Sue, be allowed to care for the children, but Esquibel was not able to contact Sue.

---

[8]Richard told one of his drug counselors that he had a meth lab in his back yard.

14

George asked that his sisters, Helen and Ellen, be able to keep the children, but he did not give contact information for them, and Esquibel never talked to them. George's mother, Joyce, told Esquibel that neither Helen nor Ellen would be able to care for the children, but Joyce asked that she be considered for placement.

Joyce came to most of Richard's visits with the children and acted appropriately and lovingly. Mother wanted the children to be placed with Joyce. However, at a family group conference, Joyce allegedly said that she would not be able to keep her daughter, Leanna Scoggins (one of K.B.'s aunts), away from the children, and this concerned CPS because Scoggins had a "reason to believe" CPS finding against her.[9] Scoggins said that she would move in with Joyce if the children lived there. CPS was also reluctant to place the children with Joyce because of her age (she was seventy-six years old at the time of the trial), statements during visits that the children "tire[d] her out," her income, her housing instability, her inability to protect the children,[10] and a previous fatal accident her son had. Phillips never visited Joyce's home, but Joyce failed a home study.

---

[9]Joyce denied making this statement. Scoggins had been living with Joyce at the time of the trial for about six months. Joyce said that she would remove Scoggins from the home if needed.

[10]One of CPS's employees testified, "[Joyce] had been to the address where the kids had been staying. I can't imagine that she didn't know the condition that they were living in."

Joyce testified at the termination trial. She said that she was living in a two-bedroom apartment and that she would "love to take care" of the children. She testified that she had high blood pressure and arthritis in one knee but otherwise had good health. She said that she would receive financial help to care for the children. She explained that her son's death occurred many years ago when he pulled a deep fryer down on himself.

Mother's attorney also proposed Mary Ciano as a placement option along with some of Mother's other relatives, Charles Bednar, Charlie Bednar, and Loydean Bednar. But Mary said that she could not care for any more children, Charlie had a "reason to believe" finding for physical neglect of her daughter, Charles had a physical neglect finding, and Loydean had a CPS history and three felony convictions. Thus, CPS believed that it had exhausted all leads for placing the children with any of the parents' family members. Jennifer Thompson, a CPS supervisor, said that she would be willing to continue looking at familial placements.

**The children's placement at the time of trial and the Department's plan for the children**

The children's foster mother said that when she began caring for the children in April 2009, two-year-old L.T. did not sleep or interact with people well. She also cried excessively and shoveled any food that she saw. L.T. received developmental therapy, speech therapy, behavioral therapy, and occupational therapy. She became a "different child" from the time she came into her foster

16

parents' care; she began talking, saying random sentences, smiling and hugging, and acting more secure without crying. L.T.'s foster mother recognized L.T.'s need to receive special education once she started school because although L.T. had made progress, she still lacked some cognitive skills.

The children's foster mother described K.B., who was one and a half years old at the time of the trial, as a "perfect little bundle of joy." But K.B. was also somewhat developmentally behind (for instance, she was about four months late in learning to walk and was not talking very much). The foster mother did not want to adopt the children but said that the children were welcome to stay in the home as long as needed.

The children had weekly one-hour visits with Richard, and L.T. enjoyed the visits and left them in a good mood. Richard always brought food, toys, and clothes for both children (even though K.B. is not his child).

Phillips opined that termination of each parent's rights was in the best interests of the children. She said that the Department wanted the children to be adopted, and she believed that finding adopting parents would not be difficult, but she acknowledged that the children would need to be moved from their foster parents to be adopted, which affects their stability.

**The sufficiency of the evidence for termination**

We conclude that under the standards detailed above, these facts are legally and factually sufficient to show, clearly and convincingly, that termination of each parent's rights is in the children's best interests. The Department proved

17

that the children are young and need developmental attention. They are unlikely to get sufficient attention in the parents' care because of Mother's and George's incarceration and each parent's substantial connection with a combination of using, distributing, or manufacturing drugs.[11] *See In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding that termination was in the best interest of children when a mother had a history of abusing drugs); *In re S.B.*, 207 S.W.3d 877, 888 (Tex. App.—Fort Worth 2006, no pet.) (relying on drug use as evidence supporting termination of a father's parental rights). In fact, the children developed better after they left the parents' care and began living in their foster home.

The Department showed that the parents were careless about whether the children could be harmed by their exposure to drugs and the chemicals used to make them, and L.T. had in fact been harmed by Mother's and George's drug-related choices because she tested positive for methamphetamine. None of the parents completed all of the service plan, and the evidence is scant that Mother or George sought out many of the required services while they were incarcerated (although Mother participated in some drug and spiritual counseling). Neither Mother nor George testified that they could remain drug-free outside of a

---

[11]We recognize that a parent's imprisonment "does not automatically establish that termination of parental rights is in the child's best interest." *In re S.R.L.*, 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

confined environment, and Mother told Esquibel that her "longest clean-time was about a year and nine months."

Various members of the parents' family could not care for the children, could not be located, or were not qualified to have custody of them because of previous negative involvement with the Department or other factors. The children were in a stable, positive environment at the time of the termination trial, and they could remain there until the Department found a permanent adoptive home.

Neither Mother nor George had been found guilty of the charges related to CPS's April 2009 investigation.[12]   Mother contends that the trial court should have granted the Department permanent managing conservatorship of the children and readdressed termination or reunification after she resolved her criminal case.  But the evidence substantiated Mother's and George's recent drug-related behavior regardless of whether they were convicted of any specific act, and neither Mother nor George testified that they were innocent of the charges against them or provided the trial court with direct explanations of their

---

[12]The trial court could have reasonably inferred that George was responsible for the methamphetamine lab at his home because he had been previously convicted of possessing materials to manufacture the drug.  *See In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) ("[T]he trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences."); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [a mother's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs.").

19

behavior, which included leaving marijuana and a syringe within the reach of L.T. and exposing her to methamphetamine. *Cf. In re N.A.*, No. 02-10-00022-CV, 2010 WL 3834640, at *9–11 (Tex. App.—Fort Worth Sept. 30, 2010, no pet.) (mem. op.) (holding that the evidence was factually insufficient to support the trial court's best interest finding when a mother's aggravated robbery case was unresolved at the time of the termination trial, the mother denied the aggravated robbery at trial, and the Department was planning to return the mother's children before her arrest).

Based on all the facts described above, we conclude that the evidence is legally and factually sufficient to show that termination of each parent's rights is in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. Thus, we overrule both of George's points, both of Richard's issues, and Mother's first and second issues.

### The Denial of Mother's Motion for Continuance

In her third issue, Mother argues that the trial court erred by denying her motion for continuance that she filed a few days before trial. She relies on section 161.2011 of the family code, which states,

> A parent whose rights are subject to termination in a suit affecting the parent-child relationship and against whom criminal charges are filed that directly relate to the grounds for which termination is sought may file a motion requesting a continuance of the final trial in the suit until the criminal charges are resolved. The court may grant the motion only if the court finds that a continuance is in the best interest of the child.

Tex. Fam. Code Ann. § 161.2011(a) (Vernon Supp. 2010). As we recently explained,

> We review a trial court's ruling granting or denying a motion for continuance for an abuse of discretion. We do not substitute our discretion for that of the trial court. Instead, we must determine whether the trial court's action was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. The focus is on whether the trial court acted without reference to guiding rules or principles.

*In re Z.C.*, 280 S.W.3d 470, 478 (Tex. App.—Fort Worth 2009, pet. denied) (footnotes and citations omitted).

Mother argues that the "rationale for the application of [section 161.2011(a)] to grant the continuance is essentially the same" as her argument that termination was not in the best interests of the children. But we have upheld the trial court's determination that termination was in the children's best interests.

Also, although Mother's trial attorney stated during the motion for continuance hearing that Mother had an April 2010 trial date for her criminal case, the record does not establish that Mother's case was certain to be resolved at that time (Mother did not present any evidence on the issue), and the Department's attorney told the court that she had spoken "with the Assistant District Attorney assigned to the case, and it didn't seem likely that [the case] was going to be resolved in April."[13] Next, although Mother's trial attorney told the trial court that she had "learned of additional family members that may be

---

[13]Mother's criminal trial date had been reset three previous times.

21

able and willing to take custody of the children," she did not say who those relatives were (except for Mary Ciano, who, as stated above, said she could not care for the children), explain why they were qualified to care for the children, or elicit testimony from them during the brief continuance hearing. *See* Tex. R. Civ. P. 251 (requiring a showing of sufficient cause for the granting of a continuance). Moreover, the children had already been in foster care for several months at the time of the trial, and proceeding with the trial in February 2010 allowed the trial court to expedite their permanent placement. "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a).

Finally, Mother's written motion failed to comply with rule 251 because it was not verified or supported by an affidavit, and the trial court could have properly denied the motion on this ground as well. *See* Tex. R. Civ. P. 251*; In re M.M.F.*, No. 02-08-00014-CV, 2008 WL 5265033, at \*14 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.); *In re T.H.*, No. 02-07-00464-CV, 2008 WL 4831374, at \*8–9 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.); *In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

For these reasons, we conclude that the trial court did not abuse its discretion by denying Mother's motion for continuance. *See Z.C.*, 280 S.W.3d at 478. We overrule her third issue.

22

## Conclusion

Having overruled all of each parent's issues or points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED:  February 17, 2011